Fred B. SHELTON III, and John Paul Jones, Plaintiffs-Appellants Cross-Appellees,

v.

CITY OF COLLEGE STATION, et al., Defendants-Appellees Cross-Appellants.

No. 83-2765.

United States Court of Appeals, Fifth Circuit.

Jan. 6, 1986.

---

Nelkin & Nelkin, Stuart Nelkin, Rose Ann Reeser, Margaret A. Harris, Mende M. Snodgress, Houston, Tex., for plaintiffs-appellants cross-appellees.

Woodard, Hall & Primm, William B. Butler, Houston, Tex., Cathy Locke, Asst. City Atty., College Station, Tex., for defendants-appellees cross-appellants.

Before CLARK, Chief Judge, and GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, HILL and JONES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We have long insisted that review of municipal zoning is within the domain of the states, the business of their own legislatures, agencies, and judiciaries, and should seldom be the concern of federal courts. A person disappointed with a zoning decision ordinarily can interest the federal courts only in a substantial claim that the state has deprived him of a property right without due process of law. In the absence of invidious discrimination, suspect classifying criteria, or infringement of fundamental interests, our review of these quasi-legislative decisions is confined to whether the decisions were "arbitrary and capricious." This requirement of substantive due process under the fourteenth amendment, as distinguished from its quite different meaning under certain state laws and under the federal Administrative Procedure Act, is met if there was any conceivable rational basis for the zoning decision. *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 52 L.Ed.2d 171 (1979). Persuaded that there was no genuine issue of material fact and that there was a rational basis for the zoning decision in the case at bar, we affirm the district court's grant of summary judgment for the city.

I

In 1979, Fred B. Shelton, III and John Paul Jones leased a building at 403 University Drive in College Station, Texas. The building is located in the Northgate area, an older commercial district directly adjacent to the campus of Texas A & M University, which is conceded to have the worst parking and traffic problems in the city.

Years before, the city had passed a zoning ordinance requiring specified minimum numbers of off-street parking spaces for different types of businesses. Few, if any, of the existing Northgate businesses would have been able to meet the parking requirements, and the ordinance permitted the continued operation of nonconforming preexisting businesses. The ordinance provided that the parking requirements would have to be met if a business built a new building or increased its capacity, or if it changed its business to require more parking than the existing nonconforming use.

Shelton and Jones's building had previously housed a photography studio. When Shelton and Jones applied for a building permit to remodel the structure for use as a pool hall and tavern, city officials informed them that they would have to either provide the number of off-street spaces required for that use or obtain a variance from the Zoning Board of Adjustment. The two applied for a variance in August 1979. After debate over the amount of drive-in traffic the business would attract and over whether the pool hall's peak hours were the same as those of other area businesses, the Zoning Board on August 14, 1979 rejected the request by a 1–3 vote.

In an effort to satisfy the board's expressed concerns about parking, Shelton and Jones leased space in a lot some 800 feet from their building. This did not satisfy the ordinance's requirement that parking space be owned and within 200 feet of the proposed use, and Shelton and Jones twice more requested variances. The variances were denied on September 10, 1979 and October 20, 1979 respectively. Although the Zoning Board voted 3–2 in favor of each request, the ordinance required

four affirmative votes before a variance could be granted. Finally, Shelton and Jones sought a variance for use of the property as a video arcade rather than as a pool hall. The board again debated whether the arcade would attract primarily drive-in or walk-in traffic, and on January 15, 1980 rejected this fourth request by another vote of only 3–2 in favor.

Although Texas law gave Shelton and Jones a right to substantive review by a state court of the denials by the Zoning Board of the requested variance, *see* Tex. Rev.Civ.Stat.Ann. art. 1011g (Vernon Supp. 1985); *Swain v. Board of Adjustment*, 433 S.W.2d 727 (Tex.Civ.App.—Dallas 1968, writ dism'd w.o.j.), they never sought relief in the state courts. Rather, after approximately twenty months, they sued the zoning officials and the city in federal district court seeking money damages. They complained that a little more than a year after denying their last request, the board granted variances to assertedly similarly situated businesses and thus "denied [their] substantive due process rights." Shelton and Jones also alleged a denial of procedural due process in the failure of board member Murl Bailey to recuse himself from voting because his church, concerned that church parking would be reduced, opposed parking variances in the Northgate neighborhood.

Defendants moved for summary judgment based on their own affidavits, the minutes of the board meetings involving Shelton and Jones's requests, and the depositions of Jones and Shelton. Shelton and Jones, in opposition, submitted the minutes of board meetings where other businesses received variances. They also attached defendants' depositions, and pointed to planning director Al Mayo's statement that most existing Northgate businesses, including some that began operating after the zoning ordinance took effect, were not meeting the parking requirements, and that the city was not enforcing the parking rules against those other businesses. The defendants responded by citing the facts, relied on by the board in granting variances, that had made the other variance recipients less likely to generate additional parking problems than Shelton and Jones's proposed uses; they argued that any nonenforcement of the ordinance by city building officials was irrelevant to the board's decisions to grant or deny variances legalizing noncompliance.

After briefing and oral argument, the district court granted summary judgment for the defendants on both the substantive and the procedural due process claims. The court relied on *Couf v. DeBlaker*, 652 F.2d 585 (5th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982), and *South Gwinnett Venture v. Pruitt*, 491 F.2d 5 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974), in holding that its review was confined to whether the zoning decisions were arbitrary and capricious. Although finding that there might be some "inferences," "allegations," and a "scintilla of evidence" in the record, the court concluded that "there [was] no evidence that the refusal to grant the variance in this case was arbitrary and capricious." On the procedural due process count, the court quoted *Couf*'s holding that local zoning decisions were legislative in nature and governed only by limitations on legislative procedure, and that even actual bias on one decisionmaker's part would not violate procedural due process in such situations.

A panel of our court affirmed the summary judgment as to the procedural due process claim, but reversed the grant of summary judgment as to the claim of substantive due process, finding that "a genuine dispute of material fact is demonstrated as to whether the seemingly arbitrary denials of the parking variance were reasonably based on fact." 754 F.2d 1251, 1256 (5th Cir.1985). Shelton and Jones urge that they also claimed that the board's later grants of variances on assertedly similar facts was a denial of equal protection. We do not hereafter separately focus upon this claimed denial of equal protection. We conclude that there was a rational basis for the legislative decisions. The classifica-

tions were therefore valid, and we need not address other asserted deficiencies.

## II

### -1-

Deprivation by the state of a protected interest in life, liberty, or property is prerequisite to a claim for denial of due process. The property interest asserted in this case was a right under state law to seek a variance from an otherwise valid restriction of use.

It is not at all clear that the state has deprived Shelton and Jones of such a property right. The University Drive real estate was subject to an ordinance that required a certain amount of parking for its use. Shelton and Jones did not attack the ordinance or its restriction upon their use of the property. The state gave a "right" to seek a variance, which included review of the Zoning Board's decision by a state district court. It can be argued that because Shelton and Jones bypassed this state-furnished remedy, the state did not deprive them of any property, at least to the extent that the ignored remedy was a part of the protected property interest.

Shelton and Jones reply that this argument rests on an overly narrow view of their property. They argue that, viewed in more general terms, use of their property has been restricted and that arbitrarily refusing the requested variances deprived them not only of the state-conferred right to seek a variance, but also of the underlying use of property. Because we conclude that the Zoning Board indisputably had available a rational basis for its zoning decision, we do not today undertake the task of defining the property right in question or deciding the related question of whether the state has deprived Shelton and Jones of any property.

### -2-

■ In reviewing a claim that a state has denied substantive due process by zoning property without a rational basis, a court could pursue either of two analytical tracks. A regulatory decision can be legislative or it can be adjudicative, and it will be reviewed differently depending on which category it is placed into. Our characterization of zoning decisions as "quasi-legislative," *South Gwinnett Venture v. Pruitt,* 491 F.2d 5, 7 (5th Cir.) (en banc), *cert. denied,* 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974), might suggest ambivalence in our choice between these two tracks. Such a suggestion of uncertainty is not warranted. We have plainly and consistently held that zoning decisions are to be reviewed by federal courts by the same constitutional standards we employ to review statutes enacted by the state legislatures.

The most obvious difference between the two tracks is in how the judiciary reviews the facts behind the decision at issue. In the adjudicative model, historical facts are determined by judge or jury and thereafter are to be accepted unless unsupported by adequate evidence found within a defined record. In general, historical facts in the adjudicative model are case specific—for example, the speed of a car or the condition of a roadway.

Review of legislative facts is quite different. "In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true.... [H]owever, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 110–11, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979).

■ Attacks against zoning plans invoke the legislative model and have only rarely been sustained. *See, e.g., Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Nectow v. Cambridge,* 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928).[1] *Euclid* and *Nectow* held that an

---

1. *Nectow,* which expressly reaffirmed the general standard of review set out in *Euclid v. Ambler Realty Co.,* held that the zoning decision in that case bore no "substantial relation to the public

ordinance was not to be declared unconstitutional unless "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *See Moore v. East Cleveland,* 431 U.S. 494, 498 n. 6, 97 S.Ct. 1932, 1935 n. 6, 52 L.Ed.2d 531 (1977) (plurality opinion). Justice Stevens, whose concurring vote was necessary to constitute the 5–4 majority in *Moore,* expressly reaffirmed these deferential standards. *Id.,* 431 U.S. at 520–21, 97 S.Ct. at 1946; *see also Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1978).

Although *Euclid* and *Moore* were frontal attacks on zoning ordinances rather than attacks on their specific application, the Court has also, and more recently, treated the denial of a variance in a specific zoning case as a legislative act. In *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), a Chicago suburb refused to grant a zoning change from single family to multiple-family dwelling. In elaborating the proof requirements of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), handed down the previous term, the Court's analysis of the requirements for proving discriminatory purpose relied upon the legislative model. Indeed, the labor of the *Arlington Heights* opinion was to accommodate proof of racial purpose with the deference that must be shown toward the legislative process. Similarly, this court has remained on the legislative track when turning from a frontal attack on an ordinance or plan itself to a specific zoning decision. *See Blackman v. City of Big Sandy,* 507 F.2d 935, 936 (5th Cir. 1975); *South Gwinnett Venture v. Pruitt,* 491 F.2d 5, 7 (5th Cir.) (en banc), *cert. denied,* 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974); *Higginbotham v. Barrett,* 473 F.2d 745, 747 (5th Cir.1973). *Cf. Stansbery v. Holmes,* 613 F.2d 1285, 1288 (5th Cir.), *cert. denied,* 449 U.S. 885 (1980).

Nothing internal to the legislative model impedes its application to a specific zoning decision. The inquiry remains the same: was there a conceivable factual basis for the specific decision made? Whether courts will insist that support for such a regulatory decision take the form of proven historical facts or hypothesized legislative facts is not a function of whether the ordinance attacked is one of general or specific application. Rather, opting for the adjudicative track of analysis is virtually a direct proxy for deciding to review the legislative process rather than the rationality of the legislative result. This must be true unless there is an *a priori* basis, as we think there is not, for distinguishing legislative from adjudicative acts.

The script of the trial ordered by the panel in this case illustrates how its sharp move toward an adjudicative model would directly affect the structure of the state-created process for deciding zoning questions. The recording of evidence and its sources by the Zoning Board would become more important. The knowledge of the members of the board would, we must expect, be determined from the "record evidence." Their role would change from that of deciding the best course for the community to adjudicating the rights of contending petitioners. In other words, the effect of the panel decision would have been to move the function of a member of the Zoning Board from that of legislator toward that of judge.

We are confident that the panel did not intend this result. It claimed to apply the deferential standard of the legislative model—whether the zoning decisions were arbitrary and capricious—but in its analysis it shifted to the adjudicative model by insisting upon trial-type proof of both *the* purpose, or basis, of the Zoning Board decision and the rationality of its attainment. Its focus was upon record facts. Significantly,

---

health, safety, morals, or general welfare." *Nectow,* 277 U.S. at 188, 48 S.Ct. at 448. In reaching this conclusion, the Supreme Court relied on the findings of a *state* court and in no way intimated that federal courts are free to "substi-

tut[e] [their] judgment for that of the zoning authorities primarily charged with the duty and responsibility of determining [zoning] question[s]." *Id.*

it found unresolved issues of material fact from the affidavits, and from the sworn testimony of Shelton, Jones, the members of the Zoning Board, and the city manager, all of whom would presumably have testified at the ordered trial.

This approach is at odds with constitutional review of a legislative act. Justice Powell explained part of the problem in *Arlington Heights v. Metropolitan Housing Corp.*, 429.U.S. 252, 268 n. 18, 97 S.Ct. 555, 565 n. 18, 50 L.Ed.2d 450 (1976):

> This Court has recognized, ever since *Fletcher v. Peck*, 6 Cranch 87, 130–31, 10 U.S. 87, 130–31, 3 L.Ed. 162 (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government. Placing a decisionmaker on the stand is therefore "usually to be avoided." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 [91 S.Ct. 814, 825, 28 L.Ed.2d 136] (1971). The problems involved have prompted a good deal of scholarly commentary. See Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif.L.Rev. 341, 356–61 (1949); A. Bickel, The Least Dangerous Branch 208–21 (1962); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205 (1970); Brest, [*Palmer v. Thompson:* An Approach to the Problem of Unconstitutional Legislative Motive, 1971 Sup.Ct.Rev. 95, 116–18].

Although there have been suggestions that defense of a legislative decision ought to rest on articulated rather than hypothesized purposes, *see, e.g., McGinnis v. Royster*, 410 U.S. 263, 93 S.Ct. 1056, 35 L.Ed.2d 282 (1973); Gunther, *The Supreme Court, 1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86

Harv.L.Rev. 1 (1972), the panel in the case at bar went even further in that its ordered trial would have required proof of the actual purpose. Not only did the Zoning Board articulate a rational basis that was indisputably related to the general welfare, there was no question but that the articulated basis was a basis for decision. The trial ordered by the panel confounds its attempt to apply the proper standard of review of a legislative act.

Such confusion of the legislative and adjudicative models has two cardinal flaws. By sharply cutting the deference due state decisions, it would inject federal courts into matters historically the business of states and subject to their police power. It would, more specifically, alter the decisional processes for zoning issues. The difference between an inquiry into whether there was any possible rational basis for legislation and an inquiry into the actual basis of legislation is significant. A court's assumption of the power to decide between competing legislative proposals or to require the state to prove the validity of its choice is quickly the right to change the legislative process itself. Gunther, *supra.* As the Supreme Court observed in *McGinnis v. Royster*, 410 U.S. 263, 276–77, 93 S.Ct. 1055, 1062–63, 35 L.Ed.2d 282 (1973):

> The search for legislative purpose is often elusive enough, *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), without a requirement that primacy be ascertained. Legislation is frequently multipurposed: the removal of even a "subordinate" purpose may shift altogether the consensus of legislative judgment supporting the statute.

That a state may choose to make a legislative decision by a process that resembles adjudication is not our immediate concern.[2]

---

2. The manner in which a state chooses to separate and delegate governmental power under state law is ordinarily not a matter of concern under the U.S. Constitution. *See* 1 N. Singer, Sutherland Statutory Construction § 3.02 (Sands 4th ed. 1985) ("The guarantee of a republican form of government by the federal constitution does not impose the doctrine of separation of powers upon the states, so that without the adoption of the rule by a state itself there is no requirement of separation of powers in state government." (footnote omitted)); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 461 n. 6, 101 S.Ct. 715, 722 n. 6, 66 L.Ed.2d

Our question is whether anything in the fourteenth amendment requires it to do so. We have consistently said "no" to that question and we do so again today.

■ We hold that the outside limit upon a state's exercise of its police power in zoning decisions is that they must have a rational basis. The dissent would expand this traditional fourteenth amendment standard by holding that if a state sometimes chooses to exercise its zoning power in a manner that more resembles adjudication than legislation, the Constitution imposes new and greater constraints upon its exercise of the police power. Apparently, this new limit on the state's police power would, in part, take the form of allowing a federal trier of fact to set aside a zoning decision that it believed was somehow arbitrary and capricious, even if there was not only a conceivable rational basis for the decision but also an articulated basis that was indisputably rational. We reject this proposal. The states are free to make zoning decisions in what the dissent labels a "quasi-judicial" manner. But neither the Supreme Court nor this court has ever suggested that such a choice by the state works a metamorphosis of the Constitution's demand for minimum rationality. Aware of no good reason to alter settled constitutional law, we decline to set out on the path proposed by the dissent.

■ As one turns from a frontal attack on a zoning ordinance to a specific zoning decision, it is true that there is a greater likelihood of encountering protected property interests, which can trigger a procedural due process inquiry. But a state's use of an adjudication-like mechanism for zoning decisions does not by itself trigger such an inquiry or create such property rights. In any event, judicial enforcement of the Constitution's procedural minima in such cases intrudes upon the legislative process in a way that is quite different from the intrusion that accompanies a failure properly to apply the legislative model. It is one thing for federal courts to insist upon procedural rights such as fair notice and quite another to measure the relative probative force and substantive content of the resulting zoning decision. A governmental body conducting a zoning hearing might well be required by the due process clause to give notice, and perhaps certain participatory rights, to affected property owners. Although we hold that a zoning decision can be justified by hypothesized purposes in the absence of such triggering property rights, we acknowledge that when such rights are affected, a later procedural due process inquiry might require a zoning board to point to *a* rational basis that was employed in reaching its decision. We need not decide this question today because such a requirement would . indisputably have been met in this case, as the dissent appears to concede by declining to assert a violation of procedural due process. The dissent would nonetheless impose additional procedural requirements as a *substantive* matter. This ill-defined insistence on facilitating federal judicial review would effectively make compliance with the Administrative Procedure Act, or rather with some extreme interpretation of that statute, a constitutional requirement. We decline to adopt such a strained expansion of the meaning of the fourteenth amendment.

–3–

■ Given the legislative or quasi-legislative nature of zoning decisions, their re-

659 (1981) ("[T]he states are free to allocate the lawmaking function to whatever branch of state government they may choose." (citations omitted)); *Ohio v. Akron Metro. Park Dist.*, 281 U.S. 74, 79–80, 50 S.Ct. 228, 230, 74 L.Ed. 710 (1930) ("As to the guaranty to every State of a republican form of government (Sec. 4. Art. IV), it is well settled that the questions arising under it are political, not judicial, in character and thus are for the consideration of the Congress and not the courts." (citations omitted)). "The due process clause of the Fourteenth Amendment, likewise, .neither requires separation of state powers nor prohibits their delegation." 1 N. Singer, *supra*, § 4.04 (footnote omitted). *See also New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 104–08, 99 S.Ct. 403, 409–11, 58 L.Ed.2d 361 (1978) (due process clause leaves the states wide discretion to experiment with administrative mechanisms that regulate commercial enterprises).

view by federal courts is quite different from the review to which they may be subjected by state courts. *See, e.g., Fleming v. City of Tacoma,* 81 Wash.2d 292, 502 P.2d 327 (1972) (rezoning amendments are subject to review under Washington "appearance of fairness" doctrine). It is also very different from the review of certain federal administrative actions, where, by statute, a decision must be overturned if not supported by "substantial evidence" on the record. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). Unlike such schemes for administrative review, federal judicial interference with a state zoning board's quasi-legislative decisions, like invalidation of legislation for "irrationality" or "arbitrariness," is proper only if the governmental body could have had no legitimate reason for its decision. *See, e.g., Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981); *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979).

This standard, though not always fully elaborated, has in practice been uniformly followed in zoning cases. *Compare South Gwinnett Venture v. Pruitt,* 491 F.2d 5, 7 (5th Cir.) (en banc), cert. denied, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974); *Burns v. City of Des Peres,* 534 F.2d 103 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); and *Lakeside Community Hosp. v. Tahoe Regional Planning Agency,* 461 F.Supp. 1150, 1155–56 (D.Nev.1978), all basing their rejection of claims of arbitrary denials of rezoning on the zoning authority's articulation of reasons for its decision, *with Shenk v. Zoning Comm'n,* 440 F.2d 295 (D.C.Cir.1971); and *Scott v. Greenville County,* 716 F.2d 1409, 1419–21 (4th Cir.1983), sustaining arbitrariness complaints after the zoning authority could offer no legitimate ground at all for its act.

We do not suggest that a zoning decision can be justified by mouthing an irrational basis for an otherwise arbitrary decision. A denial of a building permit on the King Ranch because of inadequate parking might fall into this category. The key inquiry is whether the question is "at least debatable." *See Clover Leaf Creamery,* 449 U.S. at 464, 101 S.Ct. at 724. If it is, there is no denial of substantive due process as a matter of federal constitutional law.

–4–

We pause here to note that last term the Supreme Court used the rational basis test to strike down three legislative decisions. *See City of Cleburne v. Cleburne Living Center,* —— U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (Texas municipality's decision to bar a proposed home for the mentally retarded); *Metropolitan Life Ins. Co. v. Ward,,* —— U.S. ——, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (Alabama insurance tax favoring resident insurers); *Williams v. Vermont,* —— U.S. ——, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985) (residents-only exemption from the Vermont use tax on cars purchased out of state). The full implications of these three decisions for the deference to be given legislative acts are uncertain but essentially irrelevant to this case.

In *Ward* the Court expressly declined to decide whether there was a rational relationship between the legislative purposes and the tax differential, 105 S.Ct. at 1680, but it observed that in equal protection analysis a rational relationship between a legitimate purpose and the resulting legislation "is not difficult to establish" and the question of rational relationship need only be "at least debatable." *Id.* at 1683 (citations omitted). The Court confined its review to the legitimacy of the proffered legislative purposes themselves. In the case at bar, there is no contention that traffic control was not a legitimate purpose of the zoning decision. The only question here is whether the denial of a zoning variance "at least debatably" served the purpose of traffic control.

The *Williams* Court concluded that the buyer's residence at the time of purchase was not a rational basis for imposing different tax obligations on cars purchased outside and then brought into the state.

The Court, examining the face of the statute, could find "no relevant difference" between the two groups of taxpayers, and held only that it was improper to dismiss the action, for failure to state a claim, before an answer was filed. 105 S.Ct. at 2474. As we show below, there are such "relevant differences" in the case at bar.

In *City of Cleburne* the Court reviewed the several proffered legislative reasons for the requirement that a home for retarded persons, but not other similar residences such as dormitories, obtain a special-use permit. It found each explanation internally contradictory or absurd, and concluded that the ordinance must have "rest[ed] on an irrational prejudice against the mentally retarded...." 105 S.Ct. at 3260. As we show below, no such conclusion is necessary in the case at bar.

■ Significantly, in none of these cases did the Court suggest that legislative purpose cannot be hypothesized. Implicit in all three was the Court's acceptance of the principles that the legislature or other governing body need not express all its purposes when it acts and that the defendant in a constitutional case need not prove the legislative purpose as a historical fact. Far from treating the question of rationality as a historical fact necessarily subject to evidentiary procedures and findings of a trial court, the Court in each case looked for a conceivable rational basis for the implicit judgment of the governing body that its legislative purpose was served by its decision. Even when the deprivation of a property right triggers procedural due process standards that may require a state agency to be able to point to a rational basis employed in reaching its decision, as opposed to a basis later hypothesized by others, nothing requires proof of *the,* as distinguished from *a,* basis of decision.

–5–

Much of Shelton and Jones's energy, both below and in this court, has been devoted to arguing that their proposed businesses would not have exacerbated College Station's parking problems—they have

suggested, for example, that their businesses would have attracted mostly walk-in traffic. Under the correct standard of review, we cannot reach such questions. Not only was the control of parking and traffic congestion a legitimate purpose, it is undisputed that parking was a problem. It was also indisputably rational for the board to conclude that Shelton and Jones's proposals could have added to the parking problem. It follows that the board's decisions denying the variances cannot have been arbitrary on their own merits. Indeed, Shelton conceded in his deposition that it was "reasonable" for people to disagree as to how many customers would have driven to his business, and Jones could not say that there was "not room for any difference of opinion" on his and Shelton's requests for variances.

–6–

■ Entailed in the panel's conclusion that there are in this case issues of fact for a jury, is the further conclusion that a jury might properly find that there was a rational basis for the zoning decisions. Under the legislative model, which asks whether the factual question was at least debatable, the district court's grant of defendants' motion for summary judgment was *a fortiori* proper. Detailing the record evidence is therefore an unnecessary exercise. We turn nonetheless to that record because plaintiffs persuaded a panel of our court that there was an issue of fact for trial and because the appropriate analysis of the factual background of this case may be instructive.

Shelton and Jones rely primarily on three variances, all granted more than one year after the denial of their last request, as evidence that the Zoning Board treated them differently from identically situated applicants. The first was granted on January 16, 1981, a year after the board had denied plaintiff's last zoning request, to Michael Flowers and Stephen Larson, who had subleased Shelton and Jones's premises at 403 University Drive to operate a restaurant. The minutes of the meeting where that variance was granted show that

board member Jack Upham, a defendant here, "pointed out that the prior variance requests were for a different type of business," and "stated that the restaurant business was more competitive than those businesses proposed in earlier requests, and that walk-in business would be more likely at a restaurant." The board thus had before it a parking-related reason for distinguishing between the request of Flowers and Larson and that of Shelton and Jones. Whether a restaurant would draw more pedestrian customers in 1981 than a pool hall or arcade would have drawn a year earlier is at least debatable.

Shelton and Jones also point to a variance granted on April 21, 1981 to Johnny Lampo, the owner of a Pizza Hut at 501 University Drive, conditioned on Lampo's acquiring leased parking space. Lampo leased three spaces in the same lot that Shelton and Jones had unsuccessfully sought board approval to use. Minutes of the Zoning Board record recite that the board was persuaded that Lampo needed additional parking only for his employees, while Shelton and Jones had planned to have customers park in the distant leased lot. Whatever its ultimate validity, this was certainly a rational basis for the decision. The board could reasonably have concluded that employees would be more likely than customers to use a distant lot.

The third cited variance was granted to Ed Walsh on July 21, 1981 for a video arcade at 315 University Drive. Walsh also leased the requisite parking space, but it is undisputed that his spaces were immediately behind his business, rather than 800 feet away, as with Shelton and Jones's lot. Even so, the board initially turned down Walsh's request, and approved only a one-year variance subject to board review at year's end. The board's action here, far from being arbitrary, demonstrates a serious concern about parking entirely consistent with its treatment of Shelton and Jones.

In addition, Shelton and Jones cite the deposition testimony of city planner Al Mayo that most Northgate businesses were not supplying the amount of parking space required by the ordinance, and that some of these businesses began operations after the ordinance took effect. Shelton and Jones argued below that "no enforcement in the past ... is the same as a de facto variance," and urge here that because of the city's lax enforcement, the denials of their variance requests were arbitrary. We disagree. The undisputed evidence is that the city declined to independently inspect any operating businesses for compliance with the ordinance, and instead acted only upon citizen complaints or when businesses sought permission to remodel or expand, as Shelton and Jones did. There is no basis for concluding that this passive enforcement policy reflected city approval of existing violations, or that a business whose noncompliance did come to the city's attention would be ignored. Quite to the contrary, Mayo testified that on the one occasion on which officials of the zoning office independently became aware of a noncomplying business (Charley's Grocery), they informed it that it had to seek a variance, and the violation was ultimately eliminated. In any case, even if a policy of tacit acquiescence in existing violations were inferred, it would not render irrational the denial of a request for a variance that would formally validate noncompliance with the ordinance.

In short, the city had "at least debatable" grounds for distinguishing its action on Shelton and Jones's requests from its conduct with respect to other businesses and properties. As a matter of constitutional law, then, it did not treat Shelton and Jones arbitrarily and capriciously and did not deny them substantive due process. Our holding makes it unnecessary to address defendants' claim of immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

### III

■ Whatever be the role of procedural due process here, we are persuaded, as were the district court and the panel, that "[board member] Bailey's mere member-

ship in a church that also opposed the grant of the variances does not by itself establish bias, nor raise an issue as to an 'irrevocably closed mind' that might justify his disqualification from the hearing...." 754 F.2d at 1259 (citing *FTC v. Cement Inst.*, 333 U.S. 683, 701, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948)).

## IV

While a majority of the court has rejected the constitutional claims, we are persuaded that this suit is not "frivolous, unreasonable, or without foundation." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). We therefore reject defendants' cross-appeal for attorneys' fees under 42 U.S.C. § 1988.

The district court's judgment is AFFIRMED.

ROBERT MADDEN HILL, Circuit Judge, concurring:

Although I was a member of the panel in this case that reversed the grant of summary judgment as to plaintiffs' claim of a substantive due process deprivation arising out of the Zoning Board of Adjustment's decision not to grant plaintiffs an off-street parking variance, I am now persuaded that no substantive due process violation occurred by reason of the Board's decision. Accordingly, I join in the en banc majority's opinion holding that the district court's grant of summary judgment in this case was correct.

ALVIN B. RUBIN and ALBERT TATE, Circuit Judges, with whom POLITZ, JOHNSON and JERRE S. WILLIAMS, join dissenting:

We dissent from the majority's opinion because it fundamentally misconstrues both the character of the Zoning Board's action, and our role in reviewing such actions for compliance with fundamental constitutional guarantees. By a stroke of the judicial pen, zoning boards of adjustment have become legislatures and the action of every state or municipal agency, however petty, is now entitled to the same deference as the deliberate enactments of the highest state legislature.

The plaintiffs in this case do not challenge a zoning ordinance adopted by the vote of a local legislative body. They complain only of the allegedly arbitrary and discriminatory denial of an application for a variance from such an ordinance by an appointed Board of Adjustment to whom the city's lawmakers have delegated limited powers. The actions of such a body on the individual application of the owner of a specific property do not merit the deference accorded to legislative enactments.

The majority nominally concedes that a zoning board of adjustment is not a legislative body, although the opinion chooses to call its actions quasi-legislative. The majority professes to apply the long-accepted standard of review for the decisions of such agencies, however characterized: Only arbitrary and capricious actions of the Zoning Board would violate constitutional rights and become subject to federal judicial review. This is the standard to which we also subscribe. In applying the standard, however, the majority distorts it, equating it with "the same constitutional standards we employ to review statutes enacted by state legislatures." The test of unconstitutionality is thus alchemized from arbitrary and capricious action to whether "any conceivable rational basis supports the decision." The majority's acknowledgement *en passant* that we are not reviewing legislative action is washed over by a flood of citation to cases that in fact review enactments by truly legislative bodies.

Applying this transmuted standard, the majority finds no disputed facts that warrant taking the plaintiffs' claim past summary judgment. In practice, their standard, new in all but name, will pretermit factual disputes in every case, even when genuine disputes of material fact exist, for the actual facts and procedures that led to the Zoning Board's determination become irrelevant to the judicial inquiry. The real facts, however, must not thus be ignored. A zoning board engaged in quasi-judicial

determinations, as this one was, is subject to constraints that do not apply to a legislature. When we review the constitutionality of its actions, we must do so on the basis of its actual conduct and the facts in the record before it. The constitutionality of the quasi-judicial action of an administrative agency is not reviewed with the deference given legislative enactments, and the actions of such a board are not sanitized by post-hoc conjecture concerning the factual determinations it might conceivably have made. When a challenge creates a genuine dispute of material fact relating to the rationality of the actions of a zoning board, the plaintiff's right to a trial on the merits must not be buried in a shroud of affidavits.

## I.

The Zoning Board of Adjustment created by the City of College Station, pursuant to Texas statutory authority,[1] is typical of those found in most states. It bears no resemblance to a legislature. Its members are appointed,[2] and, in the words of the statute, "may, in appropriate cases and subject to appropriate conditions and safeguards, make special exceptions to the terms of the ordinance in harmony with its general purpose and intent."[3] The Board is empowered only to decide administrative matters and to authorize "upon appeal in specific cases" variances from the ordinance when it finds that, owing to special conditions, literal enforcement would result in unnecessary hardship to the party seeking a variance.[4] The Board has no power to enact or to amend zoning classification plans, either on a municipality-wide or other geographic basis. The limited scope of the Board's authority requires it to analyze the circum-

stances of the particular zoning problem presented, and to determine whether, for a specific property, an exception to the ordinance is warranted. The Board must hold a public hearing and give notice to the parties in interest.[5] Its decisions, unlike those of a legislature or a city council, are subject to review by the Texas courts, which may affirm, modify or reverse the board's decision.[6]

To formulate its standard of review, the majority opinion relies on what it perceives to be the applicability of legislative rather than adjudicative facts. "In general," it states, "historical facts in the adjudicative model are case specific...." Here, the Zoning Board acts and indeed must by statute act, on the basis of just such case-specific facts: those presented to it at the hearing, and conditions in the immediate geographic area. Although the Board must consider the plan and purpose of the ordinance as a whole, its primary basis for determining whether the terms of the ordinance should be varied is the actual situation of the property in question in relation to neighboring properties, the hardship on the variance applicant that would result from enforcement of the ordinance, and the effect on the community of permitting a variance. The facts involved in this kind of a decision are adjudicative because they relate to the details of one particular case.[7] Conversely, "[L]egislative facts do not usually concern the immediate parties."[8]

A board of adjustment has "no statutory power to legislate."[9] The kind of action such a board takes cannot be characterized as even quasi-legislative. Instead, it is properly, and almost universally, character-

1. *See* Tex.Civ.Stat.Ann. art. 1011g (Vernon 1963 & Supp.1985).

2. *Id.* at § 1011g(b).

3. *Id.* at § 1011g(a).

4. *Id.* at § 1011g(g)3.

5. *Id.* at § 1011g(f).

6. *Id.* at § 1011g(j)–(m).

7. 2 K. Davis, Administrative Law Treatise § 12:3, at 415 (2d ed. 1979). *Cf. Hornsby v. Allen,* 326 F.2d 605, 608 (5th Cir.1964).

8. K. Davis, *supra* note 7, at 413.

9. *Board of Adjustment of City of San Antonio v. Willie,* 511 S.W.2d 591, 593 (Tex.Civ.App.1974).

ized as a quasi-judicial or administrative act.[10]

Most zoning cases in which the quasi-legislative standard has been invoked have involved challenges stemming from the application of zoning ordinances of a legislative character, not attacks on a property-specific decision of a zoning board of adjustment.[11] Justice Stevens expressed the distinction clearly, quoting the Supreme Court of Oregon:

Ordinances laying down general policies without regard to a specific piece of property are usually an exercise of legislative authority.... On the other hand, a determination whether the permissible use of a specific piece of property should be changed is usually an exercise of judicial authority and its propriety is subject to an altogether different test.[12]

The majority's admission that procedural due process scrutiny might properly be applied to the Zoning Board's decision demonstrates the Board's nonlegislative character. The majority, however, neither admits the inconsistency involved in exacting procedural due process for legislative decisions, nor considers the limited statutory authority of the Zoning Board, the allegations of the complaint, or the specific facts here involved. Instead, it leaps from the mere fact that the Board's action affects the use of zoned property to the conclusion that the action is in itself zoning, and that a conjectural set of facts validates the Board's action. That "a state may choose to make a legislative decision by a process that resembles adjudication" is of no consequence to the majority, thereby elevating the standard of review for every state agency acting under legislative mandate to the level of the legislature itself.

This kind of reflexive response is no substitute for analysis. On other occasions this circuit has carefully scrutinized local actions that were self-proclaimed "zoning" decisions, and has refused to be dissuaded from review by the mere incantation of the word "zoning". Thus, in *Bayou Landing v. Watts*,[13] we carefully reviewed the refusal of Baton Rouge's city council to issue an occupancy permit to an adult bookstore. Distinguishing that action from zoning, we said, "Zoning ... connotes a non-particularized legislative process in which rules are promulgated and land areas designated on a general, prospective basis."[14]

The same careful distinction was observed by the Eleventh Circuit in *Southern Cooperative Development Fund v. Driggers*,[15] in which the court stated:

The plaintiffs do not challenge the exercise of legislative function by Manatee County, or the validity or legality of the zoning ordinances. On the contrary, the plaintiffs urge that the Subdivision Regulations be applied as written. What we are called upon to decide is whether the

---

**10.** *City of Eastlake v. Forest City Ent., Inc.*, 426 U.S. 668, 683–87, 96 S.Ct. 2358, 2365–68, 49 L.Ed.2d 132, 141 (1976) (Stevens and Brennan, JJ., dissenting); *Robey v. Schwab*, 307 F.2d 198, 201 (D.C.Cir.1962). *See generally* Cunningham, Rezoning By Amendment as an Administrative or Quasi-Judicial Act: The "New Look" in Michigan Zoning, 73 Mich.L.Rev. 1341, 1341–42 (1975); Note, Developments in the Law—Zoning, 91 Harv.L.Rev. 1427, 1512 (1978); 3 R. Anderson, American Law of Zoning § 20.01, at 462 (2d ed. 1977).

**11.** *See, e.g., Couf v. DeBlaker*, 652 F.2d 585, 587–90 (5th Cir.), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1981); *Stansberry v. Holmes*, 613 F.2d 1285, 1289 (5th Cir.), *cert. denied*, 449 U.S. 885, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980); *Blackman v. City of Big Sandy*, 507 F.2d 935, 936 (5th Cir.1975); *Nasser v. City of Homewood*, 671 F.2d 432, 441 (11th Cir.1982); *Rogin v. Bensalem Township*, 616 F.2d 680, 689

(3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). *But cf. Scudder v. Town of Greendale*, 704 F.2d 999 (7th Cir.1983).

**12.** *City of Eastlake v. Forest City Ent., Inc.*, 426 U.S. 668, 684, 96 S.Ct. 2358, 2367, 49 L.Ed.2d 132, 143 (1976) (Stevens and Brennan, JJ., dissenting) *quoting Fasano v. Board of County Comm'rs*, 264 Or. 574, 580–81, 507 P.2d 23, 26 (1973). *Cf.* R. Babcock, The Zoning Game 158 (1966).

**13.** 563 F.2d 1172 (5th Cir.1977), *cert. denied*, 439 U.S., 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978).

**14.** *Id.* at 1175.

**15.** 696 F.2d 1347 (11th Cir.), *cert. denied*, 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983).

Commission's actions were authorized as a matter of Florida law, and if so whether their actions were in violation of the Due Process clause of the Fourteenth Amendment.[16]

As the Circuit Court for the District of Columbia has written:

... [W]hen a complainant makes a factual showing indicating that one of [the zoning commission] actions is arbitrary that action cannot be sustained unless the Commission puts forward, or the court is otherwise able to discern, some basis in fact and law to justify the action as consistent with reasonableness.[17]

Whether a zoning action is primarily legislative or judicial depends on all of the circumstances, including the nature of the proceeding and the authority of the body that makes the determination.[18] The majority relies on *South Gwinnett Venture v. Pruitt* [19] to support its characterization of the College Station Board's decision as quasi-legislative. *Pruitt*, however, characterized only area-wide zoning and rezoning activities as quasi-legislative, a characterization essentially agreed upon by commentators and courts alike, and one with which we are in complete agreement.[20] *Pruitt* also denominated the rezoning of a single property quasi-legislative. The opinion, however, was reviewing the action of the Gwinnett County Commissioners, a legislative body empowered to enact and amend geographic zoning plans. The Commissioners, unlike the College Station Zoning Board, were not required by statute to hold an adjudicative hearing before taking action. Even so, its characterization of spot zoning as quasi-legislative has come. under recent attack.[21]

Each of the other zoning cases relied on by the majority deals only with area-wide zoning legislation.[22] In these cases, as in *Pruitt*, the courts did not pretend to ignore the actual facts on which the zoning commission, city council, or board acted, but reviewed the record to determine if the zoning decision was, in fact, rational and nonarbitrary.[23] The action of a zoning board in exercising its limited administrative authority to decide on an application for a variance differs *toto caelo* from a legislative enactment.

What is at stake in labeling a decision legislative or quasi-legislative rather than quasi-judicial is more than a linguistic nicety. A legislative enactment is entitled to deference when reviewed by the judicial branch, and must be accorded "great weight" when its constitutionality is questioned.[24] A similar degree of judicial deference is appropriate when local governments exercise their zoning powers,[25] and the decisions of local legislatures to zone or to

16. *Id.* at 1351.

17. *Shenk v. Zoning Commission*, 440 F.2d 295, 297 (D.C.Cir.1971). *See also Citizens Assoc. of Georgetown v. Zoning Comm'n of D.C.*, 477 F.2d 402, 408–09 (Ca.D.C.1973).

18. Harvard, *supra*, n. 10, at 1513.

19. 491 F.2d 5, 7 (5th Cir.) (en banc), *cert. denied*, 416 U.S. 901, 94 S.Ct. 1625, 40 L.Ed.2d 119 (1974).

20. *See*, e.g. *Cloutier v. Town of Epping*, 714 F.2d 1184, 1191 (1st Cir.1983); *Citizens Assoc. of Georgetown v. Zoning Comm'n of D.C.*, 477 F.2d 402, 408 (D.C.Cir.1973); *Gerstenfeld v. Jett*, 374 F.2d 333, 335 (D.C.Cir.1967); *Cowart v. City of Ocala, Fla.*, 478 F.Supp. 774, 780 (M.D.Fla.1979); *Sternaman v. County of McHenry*, 454 F.Supp. 240, 245 (N.D. Ill.1978); *Stephens v. City of Plano, Tex.*, 375 F.Supp. 985, 987 (E.D.Tex.1974).

21. Harris, Rezoning—Should It Be a Legislative or Judicial Function?, 31 Baylor L.Rev. 409, 409 (1979).

22. *Higginbotham v. Barrett*, 473 F.2d 745 (5th Cir.1973); *Blackman v. City of Big Sandy, Texas*, 507 F.2d 935 (5th Cir.1975); *Stansberry v. Holmes*, 613 F.2d 1285 (5th Cir.), *cert. denied*, 449 U.S. 885 (1980).

23. *See Pruitt, supra* at 7; *Higginbotham*, 473 F.2d at 748; *Blackman*, 507 F.2d at 936. *See also Stansbury*, 613 F.2d at 1289.

24. *Fullilove v. Klutznick*, 448 U.S. 448, 472, 100 S.Ct. 2758, 2771–72, 65 L.Ed.2d 902 (1980).

25. *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 103 S.Ct. 505, 509, 74 L.Ed.2d 297 (1982).

rezone are entitled to a "presumption of validity." [26]

Administrative or quasi-judicial decisions of a local zoning board are different. The appropriate standard by which the constitutionality of such a board's action is reviewed requires that we ask whether the action "is arbitrary and capricious, having no substantial relation to the general welfare." [27] There is no basis for the majority's claim that we should abdicate review of the quasi-judicial or administrative actions of a zoning board of adjustment by ignoring the record and cloaking its actions with a presumption of validity that is virtually irrebuttable. Even in *Barbian v. Panagis*,[28] the Seventh Circuit, while reciting a rule similar to that stated by the majority, carefully reviewed the evidence and the basis for the city agency's action before reaching a decision, and gave the agency none of the deference that the majority accords the College Station Board in this case.

Although the majority deprecates any review of the actual basis for the Zoning Board's decision, the opinion undertakes exactly such a review. The majority is careful to note that "the Zoning Board articulated a rational basis," and that "the articulated basis was a basis for decision." The opinion concludes with a detailed examination of the record before the Zoning Board and the rationality of the Board's decision that belies the majority's opening rhetoric.

## II.

The majority has not only applied what is in fact, although not in words, an incorrect legal standard; it has failed to attend to the procedural posture of this case. On a motion for summary judgment, the court must consider all of the evidence in the light most favorable to the opposing party to see if a genuine issue of material fact exists.[29] There are genuine issues of material fact in this case, for there is a real dispute whether the Zoning Board's action in denying the plaintiffs a variance from the city's off-street parking requirements was arbitrary and capricious.

The plaintiffs showed that similar variances had been granted to other businesses in the area. According to the city director of planning, almost every business in the area at that time failed to comply with the parking requirements. Moreover, a subsequent occupant of the very property involved was granted a variance from the parking requirements by the Zoning Board. The majority examines each piece of this evidence separately and asks only whether any single bit raises a genuine issue of fact in and of itself. However, the proper approach is to look at the cumulative effect of the evidence. If, taken as a whole, the evidence raises a material factual dispute, then summary judgment should not be granted.[30]

The majority pretends not to inquire whether the Board in fact acted arbitrarily or capriciously but only whether its lawyer, or the court, can conjecture an after-the-fact basis for its decision. The proper question to ask when reviewing a non-legislative determination, however, is whether a rational basis *in fact* existed when the action was taken.[31] No plaintiff will be able to overcome the "at least debatable" standard constructed by the majority. To do so, he would be required, by affidavit, to foreclose beyond dispute any possibility other than caprice and arbitrariness. Since this will be impossible when ex post facto conjecture will suffice, the property owner's right to due process will be consistently

26. *Pruitt, supra,* 491 F.2d at 7.

27. *Pruitt, supra,* 491 F.2d at 7.

28. 694 F.2d 476 (7th Cir.1982).

29. *Harrison v. Byrd,* 765 F.2d 501, 504 (5th Cir.1985).

30. *Powers v. Nassau Development Corp.,* 753 F.2d 457, 462–63 (5th Cir.1984), *on suggestion for rehearing en banc,* 756 F.2d 1084, 1085 (5th Cir.1985) (per curiam).

31. *Robey v. Schwab,* 307 F.2d 198 (D.C.Cir. 1962). *See supra* note 21. *Cf. Harris v. Tobriner,* 304 F.2d 377, 378 (D.C.Cir.1962); 5 B. Mezines, J. Stein & J. Gruff, Administrative Law § 43.02[7] (1985).

short-circuited by judgment as summary in operation as its name implies.

### III.

The attentive reader of judicial opinions will surely ask: why was this case taken en banc? The majority opinion is based on the same standard of review adopted by the panel and this dissent. The only apparent question remaining is whether or not there is a genuine dispute of material fact sufficient to carry the case past the guillotine of summary judgment. Such a case-specific inquiry would not appear to constitute the kind of issue to which en banc rehearings are restricted by Fed.R.App.P. 35, and by our own internal operating procedures, for it involves neither a question of exceptional importance nor the necessity of maintaining uniformity of decisions. If the case is exceptionally important, it is because of something that lurks beneath the surface. The majority opinion gives lip service to judicial review while it abdicates that power. We would not endow minor municipal bodies with such unreviewable authority to trench upon constitutional rights.