**B.J. REID and Texas RWR, Inc.,**
**Plaintiffs–Appellees,**

v.

**ROLLING FORK PUBLIC UTILITY**
**DISTRICT, et al.,**
**Defendants–Appellants.**

No. 87–2379.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1988.

Rehearing Denied Oct. 12, 1988.

Reginald H. Wood, William E. Schweinle, Jr., Stubbeman, McRae, Sealy, Laughlin & Browder, Houston, Tex., for defendants-appellants.

C. Charles Dippel, Charles R. Huber, Jr., Sears & Burns, Houston, Tex., for plaintiffs-appellees.

Before CLARK, Chief Judge, GARZA and POLITZ, Circuit Judges.

CLARK, Chief Judge:

B.J. Reid and his company, Texas RWR, Inc. (RWR), brought this action pursuant to 42 U.S.C. § 1983 alleging that the Rolling Fork Public Utility District (the District) and two members of its Board of Directors (the Board), Phillip Hardy and Barbara Murdock, denied plaintiffs equal protection by declining to grant a sewage treatment commitment for a tract of land owned by plaintiffs. The essence of the complaint is that the Board refused to grant the sewage commitment out of dislike for B.J. Reid's father. Finding the jury instructions to contain error which affected the substantial rights of defendants, we vacate the verdict rendered against the District and the two Board members and remand the case for a complete retrial.

I.

On September 21, 1983, B.J. Reid acquired ownership of RWR from his father, Jack Reid. Before this change of ownership, RWR approached the District with a plan to purchase a tract of land known as Reserve C and build 175 condominium units. On November 8, 1982, the Board informed RWR that the capacity of the District's treatment plant did not permit issuance of a commitment to serve all 175 units. The Board, on November 24, 1982, issued a commitment to serve 85 condominium units. It reached this figure by converting to an equivalent number of condominium units the fifty single family units the District was already obligated to serve on Reserve C as a result of prior District action.

As part of the effort to develop plans for the expansion of the sewage treatment plant, Jack Carter, the District's engineer, mailed a planning letter to developers inquiring about their water and sewer needs. The letter stated that the land of developers who fail to respond would be allocated capacity in the expanded plant as if a conventional single family development were planned. This letter was mailed to record titleholders of Reserve C, including Jack Reid. No response was ever received concerning the needs of the owners of Reserve C.

On October 10, 1983, B.J. Reid, on behalf of RWR, requested a commitment to serve a total of 175 units. The Board deferred any decision until its next meeting. On November 14, 1983, the Board by a vote of four to one denied RWR's application. According to the minutes of this meeting, the Board considered the following factors: (1) "increase in the district's tax base;" (2) "tax payment history of Reid associated properties;" (3) "credibility of the individu-

als involved in Texas RWR, Inc.;" (4) "history of problems between the District and the Reid associated companies;" (5) "development performance history of the principals involved in Texas RWR, Inc.;" (6) "lack of cooperation of the principals involved in Texas RWR, Inc. in their dealings with the District" including their failure to respond to the planning letter; and (7) "[a]ctual capacity in the District's plants."

The institution that financed purchase of Reserve C, Mainland Savings Association (Mainland Savings), commenced foreclosure proceedings. In an April 2, 1985 letter, B.J. Reid again requested the District to issue a commitment to serve the project. The Board adopted a resolution on April 17, 1985 "find[ing] it in the best interest of the District to declare that it is not opposed to granting utility service in the amount requested by" RWR if an application is filed "within thirty days." Mainland Savings foreclosed May 7, 1985.

B.J. Reid and RWR filed this suit against the District and against Hardy and Murdock, two of the four directors that voted to deny service at the November 11, 1983 meeting. The jury returned a verdict against the District and the two directors awarding $150,001 in damages to B.J. Reid and $150,001 in damages to RWR. The jury also awarded four dollars in punitive damages, one dollar to be recovered by each of the plaintiffs against Hardy and against Murdock. After the court assessed prejudgment interest, attorneys fees and costs, the defendants were held liable for a total of approximately $460,000.

## II.

The District is a conservation and reclamation district created by statute in accord with the Texas Constitution. Tex. Const. art. XVI, § 59; see also Tex.Rev.Civ.Stat. Ann. art. 8280-576; Tex.Water Code Ann. Ch. 54 (Vernon 1955 & Supp.1988). We have previously held that such districts "possess limited legislative or quasi-legislative functions" and that the legislative model rather than the adjudicatory model should be employed to determine whether a particular decision of a district comports with the equal protection clause. *Kaplan v. Clear Lake City Water Auth.*, 794 F.2d 1059, 1064 (5th Cir.1986); see also *Shelton v. City of College Station*, 780 F.2d 475, 479–82 (5th Cir.) (en banc), cert. denied, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 934–35 (5th Cir.1988).

> In ordinary civil litigation, the question frequently is which party has shown that a disputed historical fact is more likely than not to be true. ... [H]owever, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

*Vance v. Bradley*, 440 U.S. 93, 110–11, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979). Departure from the legislative model

> would inject federal courts into matters historically the business of states and subject to their police power. It would, more specifically, alter the decisional processes for zoning issues. The difference between an inquiry into whether there was any possible rational basis for legislation and an inquiry into the actual basis of legislation is significant. A court's assumption of the power to decide between competing legislative proposals or to require the state to prove the validity of its choice [quickly becomes] the right to change the legislative process itself.

*Shelton*, 780 F.2d at 481.

■ Since this case does not concern a suspect or quasi-suspect classification such as race or sex to which heightened scrutiny is given, the equal protection clause requires only a minimum degree of rationality. *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–42, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985).

■ Applying the legislative model, an equal protection violation does not arise if there is any basis for a classification or official action that bears a debatably rational relationship to a conceivably legitimate governmental end. *Shelton*, 780 F.2d at 482; *Stern v. Tarrant County*

*Hosp. Dist.,* 778 F.2d 1052, 1056 (5th Cir. 1985) (en banc), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986). As long as there is *a* conceivable rational basis for the official action, it is immaterial that it was not *the* or *a* primary factor in reaching a decision or that it was not *actually* relied upon by the decisionmakers or that some *other* nonsuspect irrational factors may have been considered. *Mahone,* 836 F.2d at 934; *Shelton,* 780 F.2d at 481–82, 484; *see also McGinnis v. Royster,* 410 U.S. 263, 274–77, 93 S.Ct. 1055, 1062–63, 35 L.Ed.2d 282 (1973). The legitimacy of a governmental end is determined by federal law, not state law. *Stern,* 778 F.2d at 1056–60.

### A.

■ Over the District's objection, the court instructed the jury as follows:

Since Rolling Fork gave in 1983 several reasons for its action, it is your responsibility to decide whether any of them is reasonably related to a legitimate function of a sewer district. If Rolling Fork employs any standard reasonably related to a legitimate function, the employment of other standards which may not be reasonably related to legitimate functions of Rolling Fork is sufficient to support a finding of a denial of equal protection of the law.

Contrary to the implication of the first quoted sentence, the range of rational grounds is not restricted to those articulated at the time the District made its decision. The second quoted sentence states the exact opposite of the proper rule of law. An equal protection violation does not arise if the District employs a standard rationally related to a legitimate governmental end, notwithstanding use of other nonsuspect but irrational standards.

The clear error in the second quoted sentence was not cured by the later instruction on causation. In this regard, the court instructed the jury: "To find that the denial of equal protection caused damage to Reid or RWR, you must find that the sewage commitment would have been issued by Rolling Fork but for the constitutionally

impermissible reasons." Despite this causation requirement, the instructions imposed too great a burden upon the District. If the District's decision bears a rational relationship to a legitimate governmental end, it is of no consequence that the District might have reached another decision but for the employment of other nonsuspect but irrational standards. The court's causation instruction authorized the jury to reweigh factors considered by the District. Use of the rational basis test in conjunction with the legislative model was designed to avoid this type of second guessing by judges or juries.

The jury instructions constitute reversible error.

### B.

Plaintiffs argue that we should nonetheless affirm the jury verdict. They contend that the Board denied service for an irrational reason—dislike of Jack Reid. The Board maintains that lack of plant capacity and failure to respond to the planning letter constitute rational reasons for denying service. Plaintiffs assert that even if there is conflicting evidence as to plant capacity, the Board cannot rely on lack of plant capacity or on failure to respond to the planning letter. Plaintiffs contend these grounds are immaterial because they requested a conditional commitment, i.e. a commitment to serve only as much development of Reserve C as the District might have capacity to serve, and they even offered to pay to expand the plant to service its development if that was necessary.

Plaintiffs' contention cannot prevail in this court. Not only does it turn on disputed facts but also it would require deviation from the legislative model. The nature of the commitment requested is not clear. RWR would have us accept that it sought a commitment to serve the development in the future only to the extent that there was sufficient plant capacity. However, the District's engineer testified that RWR had requested a more definite commitment. Moreover, Mainland Savings "Commitment letter" imposed conditions on

the issuance of a $2,350,000 development loan to RWR. With regard to utility commitments the letter provided:

> At least Fifteen (15) business days prior to closing, Borrower, at its expense shall furnish to Lender for its review and approval, utility commitments to the effect that water, sewer, electricity, natural gas, telephone and other utility services, including storm and sanitary sewer drainage facilities are available to the Property.

It is unclear from this letter and the other evidence introduced at trial that the lender would have accepted a vague commitment from the District to furnish whatever sewer service it could. Although B.J. Reid testified that he had offered to pay to expand the plant the evidence did not clearly establish that this offer was ever communicated to the Board.

Even if we could accept RWR's version of the facts, the District would be insulated from an action for denial of equal protection if there is any rational basis for rejecting the requested commitment. That issue must be resolved by a properly instructed jury.

### C.

Since the action must be retried, we now comment briefly on one other challenged part of the instructions which should be reconsidered by the district court if it recurs on retrial. The court instructed the jury: "Neither present lack of capacity nor overcommitment is a legitimate ground to deny a new commitment if there would be sufficient capacity when the commitments were to be exercised." A district may rationally decide that present lack of capacity or overcommitment are grounds for withholding new commitments even if it expects sufficient capacity to exist when the connection would actually be needed. Rational legislative judgment would allow a district that wishes to adopt a conservative approach to issuing commitments to take the position that orderly development required it to refuse the risk that expected future capacity might not materialize.

### III.

The errors in the jury instructions affected the verdict rendered against all of the defendants. The judgment appealed from is vacated and the cause is remanded for a complete retrial of all issues as to all parties.

VACATED and REMANDED.