**REVISED APRIL 9, 2009**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 20, 2009

Charles R. Fulbruge III
Clerk

No. 08-50429

CORNERSTONE CHRISTIAN SCHOOLS; SCOTT FARHART; SANDRA
FARHART; J F, Minor child of Scott and Sandra Farhart

Plaintiffs - Appellants

v.

UNIVERSITY INTERSCHOLASTIC LEAGUE (UIL); WILLIAM FARNEY;
CHARLES BUTCHER

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas

Before KING, BENAVIDES, and CLEMENT, Circuit Judges.

KING, Circuit Judge:

Scott and Sandra Farhart enrolled their minor son, J.F., at Cornerstone Christian Schools. The Farhart parents, J.F., and Cornerstone Christian Schools together bring this suit against the University Interscholastic League alleging that it infringed plaintiffs' free exercise, equal protection, and due process rights when it denied Cornerstone Christian Schools an opportunity to apply for membership. Defendants moved to dismiss the complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. The district court converted

parts of defendants' motion to dismiss into a motion for partial summary judgment and sought additional motions, briefing, and supporting evidence. It then granted defendants' motion to dismiss principally because plaintiffs failed to state a claim on which the court could grant relief. It simultaneously granted defendants' motion for summary judgment because plaintiffs failed to raise a genuine issue of material fact that Cornerstone Christian Schools was eligible for membership in the University Interscholastic League pursuant to section 12(d) of its Constitution and Contest Rules. We affirm the district court's judgment in so far as it granted defendants' motion to dismiss and resulted in the dismissal of the case, and we vacate the district court's judgment in so far as it granted defendants' initial motion for summary judgment.

## I. FACTUAL & PROCEDURAL BACKGROUND

Cornerstone Christian Schools ("Cornerstone"), Scott and Sandra Farhart, and their minor son, J.F., bring this suit against the University Interscholastic League and its director and chairman (collectively, the "UIL" or "defendants"). Plaintiffs allege that the UIL violated the First Amendment's Free Exercise Clause and Fourteenth Amendment's Due Process and Equal Protection Clauses when it adopted and enforced section 12(d) of the UIL's Constitution and Contest Rules ("section 12(d)"), which effectively banned most nonpublic schools from membership.

### A.    Factual Background

Cornerstone is a Christian college preparatory school located in San Antonio. It incorporates athletics into its educational program. J.F. attends Cornerstone and has participated in numerous sports programs, including football, track, soccer, and baseball, as well as other extracurricular activities.

2

From 1998 until September 2006, Cornerstone was a member of the Texas Association of Private and Parochial Schools ("TAPPS").[1] TAPPS is an interscholastic athletic and academic league for private and parochial schools. Membership in TAPPS is governed by an annual contract. Each year, member schools complete the contract, which TAPPS effectively treats as an application for renewal. In September 2006, TAPPS's directors voted not to renew Cornerstone's contract. After TAPPS's directors decided not to continue Cornerstone's membership, Cornerstone inquired about applying for UIL membership.

The UIL is a non-profit association of public schools and open-enrollment charter schools in Texas that organizes interscholastic athletic and academic competition. The UIL is part of the Division of Continuing Education of the University of Texas at Austin, submits its rules and procedures to the commissioner of the Texas Education Agency for approval, and files its accounting report with the governor of Texas and each house of the Texas Legislature. *See* TEX. EDUC. CODE § 33.083(d). The UIL is the largest interschool organization of its kind in the world, comprising over 1300 public school districts.

Since 2003, the UIL has permitted private and parochial schools to apply for membership if they meet specific and narrow qualifications established by section 12(d). That section states:

> PRIVATE SCHOOLS. Unless its right to participate has been suspended or revoked for violating rules or codes by another league similar to the UIL, a Texas non-public school may apply for UIL membership in the largest conference (currently 5A) provided the school meets all of the following conditions:

---

[1] On at least two occasions within that period that are not at issue in this case, Cornerstone's ability to participate in TAPPS was either revoked or suspended.

* * *

(2)     school does not qualify for membership in any other organization similar to the League;

* * *

UIL CONSTITUTION AND CONTEST RULES FOR 2006–2007 § 12(d).   Under this provision, the UIL has admitted two large parochial schools; however, when Cornerstone sought to apply for membership in the UIL in September 2006, the UIL refused to allow Cornerstone to submit an application for the stated reason that Cornerstone was eligible for admission to other organizations similar to the UIL.   According to plaintiffs' complaint, the UIL's understanding was that such other organizations included TAPPS, the Texas Christian Athletic League ("TECAL"), and the Southwest Preparatory Conference (the "SPC").

B.     **Procedural History**

Plaintiffs filed their complaint on December 12, 2007, seeking a judgment declaring section 12(d) unconstitutional and enjoining its enforcement.   They alleged that section 12(d) burdens Cornerstone's parents' and students' free exercise of religion and Cornerstone's parents' right to control their children's education by sending them to a parochial school.   They also alleged that the policy violates equal protection because it excludes nonpublic schools and arbitrarily distinguishes between nonpublic schools of different sizes, effectively limiting membership to the two large parochial schools already admitted into the UIL.   Finally, plaintiffs argued that section 12(d) violates chapter 110 of the Texas Civil Practices and Remedies Code, a claim not at issue on appeal.

In their answer, defendants averred that Cornerstone was ineligible for membership under section 12(d) because it was eligible for membership in another league and because its membership in TAPPS was suspended or revoked for rules violations.   Defendants then filed a motion to dismiss under Rule 12(b).   They moved to dismiss all or part of the complaint on three grounds:   first, they

4

argued that Cornerstone lacks standing to raise the constitutional rights of its students and their parents; second, defendants asserted that section 12(d) does not burden plaintiffs' free exercise of religion or the parents' right to control their children's education; and third, they contended that section 12(d) does not violate equal protection of the laws. The district court decided to convert portions of the motion to dismiss into a motion for summary judgment. In particular, the court asked for summary judgment motions, briefing, and supporting evidence regarding Cornerstone's qualification to apply for membership in the UIL under section 12(d). After discovery, defendants reasserted their motion to dismiss and filed an initial motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure, which plaintiffs opposed. The primary disputes with regard to the summary judgment motion were, for the purpose of application of section 12(d), whether Cornerstone qualifies for membership in TAPPS and whether TAPPS's decision not to renew Cornerstone's membership constituted a suspension or revocation of Cornerstone's right to participate in TAPPS. An affirmative answer to either inquiry would disqualify Cornerstone from membership in the UIL under section 12(d).

In a single order, the district court granted defendants' motion to dismiss and initial motion for summary judgment. The court dismissed the complaint because: (1) Cornerstone lacks standing to bring the free exercise claim on behalf of its students and their parents because those claims "must be asserted by the individuals whose religion is being infringed"; (2) section 12(d) "does not burden the exercise of religion, does not violate the First Amendment, and does not violate the fundamental right of Cornerstone parents to control the education of their children"; and (3) section 12(d) does not violate equal protection because it "bears a rational relationship to the state's interest of

5

reducing unfair or unequal competition in extracurricular activities and prevents the UIL from becoming a dumping ground for those private schools eligible or qualified to compete in TAPPS or similar organizations but violate rules to be precluded from those organizations in order to join the UIL [sic]." The district court proceeded to grant defendants' initial motion for summary judgment because Cornerstone is ineligible for membership in the UIL under section 12(d) for two alternative reasons: (1) TAPPS's decision in 2006 not to renew Cornerstone's membership was predicated on Cornerstone's recruiting violations and thus the equivalent of a revocation or suspension for a rules violation; and (2) Cornerstone is eligible for membership in TAPPS.[2]

Plaintiffs appeal the district court's order.

## II.  DISCUSSION

We review de novo the district court's order granting defendants' motion to dismiss under Rule 12(b)(1) based on Cornerstone's lack of standing to allege a free exercise claim. *See Donelon v. La. Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 566 (5th Cir. 2008). We apply the same de novo standard to review the district court's order granting defendants' motion to dismiss under Rule 12(b)(6) for failure to state a free exercise, due process, or equal protection claim. *See, e.g.*, *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004). To resist a dismissal pursuant to Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level

---

[2] In its 58-page opinion, the district court inexplicably digresses at length into quotations from both the Bible and children's stories, as well as into a recitation of the "ironic background" of plaintiffs' claims—all before discussing the facts relevant to disposing of this case. Those digressions are inappropriate and unnecessary to the otherwise straightforward resolution of the case.

6

on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (citations omitted).

Similarly, we review de novo the district court's order granting defendants' motion for summary judgment under Rule 56 and apply the same standard as did the district court. *See Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). We will affirm the district court's order granting summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

Reviewing de novo, we affirm the district court's order dismissing Cornerstone for lack of standing to allege a free exercise claim, dismissing plaintiffs' free exercise, due process, and equal protection claims, and thus dismissing the case. Because these decisions resolve all claims alleged in the complaint and result in dismissal of the case, we vacate the district court's order granting defendants' motion for summary judgment as to Cornerstone's qualification under section 12(d).

## A.    Cornerstone's Standing to Allege a Free Exercise Claim

No party contests that the Farharts, parents and child, have standing to bring free exercise, due process, and equal protection claims.[3] Cornerstone, on the other hand, lacks standing to bring a free exercise claim.[4] Plaintiffs bear the

---

[3] The complaint alleges facts sufficient to establish the Farharts' standing at the time of filing. Prior to oral argument, the court asked plaintiffs to confirm that J.F. remains a student at Cornerstone and that any favorable decision will benefit him. Plaintiffs have confirmed that J.F. is a senior, graduating in May 2009, and that he will benefit from a favorable decision. This confirmation is sufficient to establish Farharts' continuing standing to bring free exercise, due process, and equal protection claims in the context of our consideration of the motion to dismiss.

[4] The scope of the district court's order with respect to Cornerstone's standing is not clear. In their motion to dismiss, defendants argued that "[t]he parental, free exercise of

burden of establishing Cornerstone's standing "in the same way as any other matter on which the plaintiff[s] bear[] the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Thus, on a motion to dismiss, plaintiffs must allege facts that give rise to a plausible claim of Cornerstone's standing. *Id.*

> Under well-established precedent:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Here, defendants contest only the third element, arguing that the alleged free exercise claim requires the participation of the individual parents and students.

In *Harris v. McRae*, 448 U.S. 297 (1980), the Supreme Court considered the third element of the *Hunt* test in the context of a free exercise claim made by a women's rights organization opposing federal statutory limitations on

---

religion, and equal protection rights asserted by the plaintiffs belong to the students of [Cornerstone] and their parents, not to the school." As such, defendants asserted that Cornerstone lacked standing to challenge the UIL's policy. The district court's judgment granted that motion. It did so, however, consistent with its accompanying order. In that order, the district court only analyzed Cornerstone's standing to bring the free exercise claim; it did not mention Cornerstone's standing to bring due process or equal protection claims. Nor did it expressly dismiss Cornerstone as a party to the suit, which would have been the expected result of granting defendants' motion to dismiss. In addition, the court proceeded to grant defendants' motion for summary judgment on the basis that Cornerstone was ineligible for membership in the UIL, a decision incompatible with any conclusion other than Cornerstone's continuing status as a party to the case. Because the Farharts have standing to assert all relevant constitutional claims and as these issues have not been raised by the parties in their briefing to this court, we express no opinion regarding Cornerstone's standing to bring a due process or equal protection claim.

8

Medicaid reimbursement for abortion procedures. To determine whether the free exercise claim required individual participation, the Court examined the claim's substance. *Id.* at 321. It held that, "[s]ince 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion,' the claim asserted here is one that ordinarily requires individual participation," and "the participation of individual members . . . is essential to a proper understanding and resolution of their free exercise claims." *Id.* (quoting *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963)); *see also Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 292 n.25 (5th Cir. 2001).

*Harris* precludes Cornerstone's standing to bring the free exercise claim in this case. The involvement of parents and students, such as the Farharts, is essential to the resolution of the individualized element of coercion within this free exercise claim.[5] Although Cornerstone lacks standing to assert a free exercise claim, the Farharts have standing, so we now proceed to a discussion of the merits of all of plaintiffs' claims.

**B.    Free Exercise, Due Process, and Equal Protection Claims**

   **1.    Free Exercise and Due Process Claims**

---

[5] Plaintiffs contend that because Cornerstone seeks only declaratory or injunctive relief, participation of its parents and students is not required. In *Warth v. Seldin*, 422 U.S. 490 (1975), the Supreme Court held that "[i]f in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* at 515. The flaw in plaintiffs' argument is that, even if the benefit will inure to the appropriate individuals, the third prong of *Hunt* is not satisfied unless "*neither the claim asserted* nor the relief requested requires the participation of individual members in the lawsuit." *See, e.g.*, *Rent Stabilization Ass'n v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (quotation marks and citation omitted, emphasis in original). That Cornerstone seeks only prospective relief says nothing about the *claim asserted*.

Section 12(d) does not infringe plaintiffs' free exercise or due process rights. Plaintiffs' primary argument is that, by denying UIL membership to nearly all nonpublic schools, section 12(d) imposes an unconstitutional condition on the Farharts' decision to send J.F. to parochial school, thus infringing their free exercise and due process rights. The First Amendment's prohibition on the making of a law "prohibiting the free exercise" of religion applies to the states through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The "free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990).[6] Thus, the First Amendment excludes all "governmental regulation of religious beliefs as such." *Sherbert v. Verner*, 374 U.S. 398, 402 (1963). The government does not impermissibly regulate religious belief, however, when it promulgates a neutral, generally applicable law or rule that happens to result in an incidental burden on the free exercise of a particular religious practice or belief. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Employment Div.*, 494 U.S. at 879. Moreover, the First Amendment does not "require the Government *itself* to behave in ways that the individual believes

---

[6] Although Congress passed the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, in part to abrogate the Court's decision in *Employment Division*, the Court in *City of Boerne v. Flores*, 521 U.S. 507, 532–36 (1997), held that the RFRA was unconstitutional because it exceeded Congress's remedial powers under section 5 of the Fourteenth Amendment. *See Adkins v. Kaspar*, 393 F.3d 559, 566–67 (5th Cir. 2004). Thus, the holding of *Employment Division* remains valid as to state and municipal actions. As such, "the government may not, for example, (1) compel affirmation of religious beliefs; (2) punish the expression of religious doctrines it believes to be false; (3) impose special disabilities on the basis of religious views or religious status; or (4) lend its power to one side or the other in controversies over religious authorities or dogma." *Parker v. Hurley*, 514 F.3d 87, 103 (1st Cir. 2008) (citing *Employment Div.*, 494 U.S. at 877).

will further his or her spiritual development or that of his or her family." *Bowen v. Roy*, 476 U.S. 693, 699 (1986).[7]

The Farhart parents also assert a fundamental right under the Fourteenth Amendment's Due Process Clause to direct the upbringing and education of their child. Parents have a fundamental interest in raising and educating their children. *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Littlefield*, 268 F.3d at 288. This fundamental right, however, is not absolute, and states can subject it to reasonable regulation, particularly when the state's interest relates to the provision of public education. *See Littlefield*, 268 F.3d at 291 (listing cases permitting state encroachment onto the parent's right to direct a child's upbringing); *see also Kite v. Marshall*, 661 F.2d 1027, 1029 (5th Cir. 1981) (same). The parents' right protects their prerogative to make choices regarding the type of education—*e.g.*, public, private, or home-schooling—that their child receives but not particular components of that education, such as participation in interscholastic athletics or enrollment in particular courses. *See Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 27 (5th Cir. 1997) (rejecting "that there is any protected interest in the separate components of the educational process, such as participation in interscholastic athletics") (citing, e.g., *Seamons v. Snow*, 84 F.3d 1226, 1234–35 (10th Cir. 1996)); *accord Swanson ex rel. Swanson v. Guthrie Indep. Sch. Dist. No. I-L*, 135 F.3d 694, 699 (10th Cir.

---

[7] For example, in *Locke v. Davey*, 540 U.S. 712 (2004), the Supreme Court, considering a state's denial of scholarship funds to pursue a degree in devotional theology, held that:

> In the present case, the State's disfavor of religion (if it can be called that) is of a far milder kind. It imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community. And it does not require students to choose between their religious beliefs and receiving a government benefit. The State has merely chosen not to fund a distinct category of instruction.

*Id.* at 720–21 (citations omitted).

1998) ("[P]arents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject.").[8]

This court has considered many variations of claims alleging infringement of constitutional rights in the context of eligibility rules for competition in interscholastic leagues and has uniformly rejected constitutional challenges to those rules. *See, e.g.*, *Hardy v. Univ. Interscholastic League*, 759 F.2d 1233, 1234 (5th Cir. 1985) ("Participation in interscholastic athletics is not an 'interest' protected by the Due Process Clause."); *Niles v. Univ. Interscholastic League*, 715

---

[8] "A regulation that is neutral on its face and is motivated by legitimate secular concerns may, in its application, offend the first amendment requirement of governmental neutrality if it *unduly burdens* the free exercise of religion." *Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 157 (5th Cir. 1980) (emphasis added) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 220 (1972)). Such undue burden may occur where the plaintiff alleges a viable free exercise claim in conjunction with another colorable constitutional claim, giving rise to heightened scrutiny. *See Employment Div.*, 494 U.S. at 880 ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as . . . the right of parents . . . to direct the education of their children." (citations omitted)). Although the Farharts do not expressly allege such a "hybrid claim," they do allege violations of both their free exercise and parental control rights and cite *Yoder*, the archetypal hybrid rights case dealing with the overlap of those rights. In that case, the Court invalidated Wisconsin's compulsory-attendance law, which "affirmatively compel[led] [the Amish], under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." 406 U.S. at 218. After determining that, "when the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a 'reasonable relation to some purpose within the competency of the State' is required to sustain the validity of the State's requirement under the First Amendment," *id.* at 233, the Court invalidated the law because, "by substantially interfering with the religious development of the Amish child and his integration into the way of life of the Amish faith community at the crucial adolescent stage of development, [the law] contravenes the basic religious tenets and practice of the Amish faith, both as to the parent and the child," *id.* at 218. As discussed below, we conclude here that "the nature of this record" is dissimilar to that of *Yoder* and that plaintiffs do not have a colorable claim for a violation of either their free exercise or their due process rights; therefore, we need not consider whether any potential overlap of the asserted rights requires a heightened level of scrutiny. *See Swanson*, 135 F.3d at 700.

12

F.2d 1027, 1031 (5th Cir. 1983) ("Forthrightly stated, the gravamen of the complaint here is the denial of the right to participate in interscholastic sports, not the rights to interstate travel, to earn a living or to live with or apart from one's family."); *Walsh*, 616 F.2d at 158–60 (upholding a rule that "places an indirect and incidental burden on the free exercise of the religious beliefs of these parents" because "[a] student's interest in participating in a single year of interscholastic athletics amounts to a mere expectation" that "falls outside the protection of due process" (quotation marks omitted)). *But cf. La. High Sch. Athletic Ass'n v. St. Augustine High Sch.*, 396 F.2d 224, 228–29 (5th Cir. 1968) (disallowing racial discrimination in the admission of schools to the Louisiana High School Athletic Association).

We reach the same conclusion and reject the claims here because plaintiffs fail to show that section 12(d) unduly burdens either free exercise or due process rights or any combination thereof. In fact, as plaintiffs admitted during oral argument, free exercise is not substantially implicated in this case. Section 12(d) is religiously neutral and generally applicable: it does not distinguish between private and parochial nonpublic schools and does not deny the Farharts their right actively to practice their faith. Further, section 12(d) imposes neither criminal nor civil sanctions on any type of religious education, service, or rite. Nor does it unduly restrict J.F.'s ability to obtain a religiously centered education—including participation in interscholastic competition and events—separate and apart from the public school system.[9] Any burden on free exercise is nearly imperceptible. Moreover, plaintiffs have not alleged that attending Cornerstone is part of a religious belief or integral to their culture as

[9] Indeed, Cornerstone may seek reentry into TAPPS, apply for membership in other leagues such as TECAL or the SPC, or compete against other schools through one-on-one arrangements.

13

was the concern in *Yoder*; rather, it is a matter of religious preference.[10]  Clearly, section 12(d) does not unduly burden the Farharts' free exercise of their religion.

Likewise, section 12(d) does not impermissibly infringe the Farharts' due process right to control J.F.'s education.  It does not prohibit the parents from enrolling J.F. at Cornerstone or place any restriction on their exercise of that choice.  Simply put, the Farharts desire a benefit offered to public school students that J.F. lost through their decision to send him to nonpublic school.  However, the Farharts' right to educate J.F. at Cornerstone does not come with a concomitant right to opt into those portions of a public education that they deem advantageous.  The loss of access to certain aspects of public education was part of the calculus that colored the Farharts' choice between public and nonpublic education.  That calculus included the UIL and section 12(d), Cornerstone's size, and any other applicable background rules or conditions, including restrictions on access to public school courses.[11]  At least initially, the Farharts accepted that J.F. would participate in competition through TAPPS, not the UIL.  The "constitutional" infringement did not arise until Cornerstone lost its membership in TAPPS.  That Cornerstone is no longer a member of TAPPS does not now render the UIL's rule an unconstitutional burden on their choice.

---

[10] The differences between this case and *Yoder* are instructive.  Here, the complaint and pleadings do not reveal that participation in public interscholastic competition is central to the Farharts' religion; in fact, unlike the isolation sought by the Amish in *Yoder*, the Farharts simultaneously seek to obtain for J.F. a separate religious education and the benefits of public interscholastic competition.

[11] During oral argument, plaintiffs attempted to distinguish educational components such as science classes, which are integral to education and thus integral to their choice of parochial school, from those such as the UIL, which are purportedly not integral to the educational system and thus independent of their choice.  Such a distinction, to which we give no credence, only undermines plaintiffs' argument that section 12(d) burdens the Farharts' right to control J.F.'s education.

14

Although clothed in free exercise and due process claims, this lawsuit is fundamentally about J.F.'s right to participate in interscholastic competition. As we have previously stated:

> [W]e are not super referees over high school athletic programs. Questions about eligibility for competition may loom large in the eyes of youths, and even their parents. We do not disparage their interest in concluding, as here, that these issues are not of constitutional magnitude. Behind this observation rest important values of federalism and the reality that the mighty force of the constitutional commands ought not to be so trivialized.

*Hardy*, 759 F.2d at 1235. Following that lead, we hold that section 12(d)'s restriction on nonpublic schools' eligibility for membership does not unduly burden plaintiffs' fundamental rights.[12]

---

[12] Faced with the reality that section 12(d) does not unconstitutionally infringe either free exercise or due process rights, plaintiffs contend that section 12(d) unconstitutionally conditions the receipt of a public benefit—participation in the UIL—on the nonexercise of their constitutional rights. Under this theory, "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also Sherbert*, 374 U.S. at 404 ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."). Plaintiffs' theory has typically been applied to cases involving unemployment compensation, where the government leverages a system of evaluation that includes individualized or particularized assessments. *Employment Div.*, 494 U.S. at 883–84; *Bowen*, 476 U.S. at 706; *see also Fyfe v. Curlee*, 902 F.2d 401, 402–03 (5th Cir. 1990) (after individualized review, public school teacher transferred to a different position because she sent her child to private school); *Brantley v. Surles*, 718 F.2d 1354, 1355–56, 1358 (5th Cir. 1983) (after individualized meetings with board of education, public school cafeteria manager fired for sending child to private school); *accord Swanson*, 135 F.3d at 701 ("In the absence of a system of individualized exceptions to the no-part-time-attendance policy, there is no room for a *Sherbert*-type argument."). In this case, plaintiffs have not alleged that section 12(d) establishes a program or system of subjective, individualized consideration. Moreover, the broader application advocated by plaintiffs is not supported by case law, as "[d]ecisions rejecting religiously based challenges have often recited the fact that a mere denial of a governmental benefit by a uniformly applicable statute does not constitute infringement of religious liberty." *Bowen*, 476 U.S. at 704. This conclusion resonates with particular force in the area of public education because the government is allocating a benefit not to the general public but to public school students: the condition—attendance in public school—inherently

15

## 2.     Equal Protection Claim

Section 12(d) does not violate equal protection of the laws based either on its distinction between public and nonpublic schools or its purported distinction between nonpublic schools of differing sizes. The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). We inquire about equal protection of the laws "[o]nly if the challenged government action classifies or distinguishes between two or more relevant groups." *Qutb v. Strauss*, 11 F.3d 488, 492 (5th Cir. 1993). "Where . . . the classification created by the regulatory scheme neither trammels fundamental rights or interests nor burdens an inherently suspect class, equal protection analysis requires that the classification be rationally related to a legitimate state interest." *Walsh*, 616 F.2d at 160; *see also Locke*, 540 U.S. at 721 n.3. Under rational-basis scrutiny, the regulation is "accorded a strong presumption of validity" and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 319–20 (1993) (quotation marks and citations omitted).

Section 12(d) distinguishes between public and nonpublic schools, permitting only a narrow window for nonpublic schools to apply for membership

corresponds to the benefit conferred—public education and its constituent parts. *See Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 19 (1st Cir. 2004) (holding constitutional a law allocating to only public schools the "benefits the federal government has earmarked solely for students enrolled in the nation's public schools—benefits still available for [the student] were he sent to a public school, though not otherwise"). It is axiomatic that public educational systems may provide and fund programs open only to public schools and to public school students without necessarily infringing the constitutional rights of nonpublic school students.

16

in the UIL, and we assume, without deciding, that section 12(d) distinguishes between large and small nonpublic schools.[13]  Neither of these distinctions is based on a suspect classification (such as religious preference); therefore, rational-basis review applies.  Considering the deference paid by the court in this form of review, section 12(d) bears a rational relationship to the state's interest in reducing unfair competition in the UIL.  This is clearly true of the UIL's distinction between public schools, which may draw participants only from a defined geographical area, and nonpublic schools, which may draw students from anywhere, but also applies to the distinction between nonpublic schools of different sizes.  Large public schools are more capable of selecting talent from their larger populations to match large private school's recruiting ability.  Small public schools could not so effectively compete against small private schools, which, as noted, are not subject to geographical limitations.  Although better alternatives may exist, the UIL need not choose the least restrictive method of achieving its desired ends.  Thus, section 12(d) does not infringe plaintiffs' free exercise, due process, or equal protection rights.[14]

_____

[13] Alternatively, we could plausibly interpret section 12(d) to permit any private school, regardless of its size, to apply to join the UIL.  If accepted into membership, the private school would then automatically be placed in the UIL's largest division, again regardless of its size. Plaintiffs concede this would be an acceptable rule.  Defendants, however, have not offered clarity on how we should interpret section 12(d)'s provision that "a Texas non-public school may apply for UIL membership in the largest conference (currently 5A)," so we will assume for purposes of the present consideration that it limits membership applications to nonpublic schools that would be classified in conference 5A if they were a public school.  We note, however, that this was not the UIL's stated reason for denying Cornerstone's request to apply for membership.

[14] We are also reluctant to grant the relief plaintiffs seek because of its breadth. Plaintiffs asks us to declare section 12(d) unconstitutional, thus opening the door to the UIL for all nonpublic schools.  The only other viable alternative under the complaint—granting an exception to Cornerstone (or perhaps all parochial schools) based on the theory that the free exercise claims elevate Cornerstone (or all parochial schools) to a higher status than secular nonpublic schools—would be equally unacceptable under federal law.  *See Swanson*, 135 F.3d

## C.    Cornerstone's Qualification Under Section 12(d)

Our above holdings dispose of all of plaintiffs' claims and result in the dismissal of the entire case; therefore, we vacate the district court's order granting summary judgment for defendants on the issue of Cornerstone's ineligibility to apply for UIL membership. The complaint does not question the decision that the UIL made under section 12(d), but only the constitutionality of that provision.[15]    Plaintiffs seek an injunction against section 12(d)'s enforcement and a declaration that it violates plaintiffs' constitutional rights. In their answer, defendants averred that their decision to deny Cornerstone an opportunity to apply for membership was based on Cornerstone's qualification for membership in another league and because Cornerstone had its right to participate in TAPPS suspended or revoked for rules violations. The district court concluded that whether the UIL properly determined Cornerstone's qualification or disqualification to apply for UIL membership was a fact question that it needed to decide through summary judgment:[16]  "In this search for the truth of why Cornerstone has brought this lawsuit, it would be most helpful to review minutes, correspondence, and other records from [TAPPS] in appropriate summary judgment form." Acceding to the court's request, defendants filed their initial    motion    for    summary    judgment    and    supporting    documentation;

---

at 701–02 (holding that the Free Exercise Clause does not require the government to provide "special treatment not accorded other home-schooled or private-schooled students" in the form of "an added exception to the part-time attendance policy [which denied home-schooled students the right to take classes in public schools], that would accommodate people who home-school for religious reasons").

[15] Although the complaint disagrees with the UIL's conclusion that TAPPS, TECAL, and the SPC are comparable leagues, it does not allege a claim arising from the UIL's application of section 12(d) to Cornerstone.

[16] Because we vacate the order granting summary judgment, we need not decide the relevant level of deference to grant to the UIL in its interpretation and application of its rules.

18

nonetheless, in that motion, they expressly preserved that "their Motion to Dismiss for failure to state a claim, as previously set forth . . . is sufficient for the Court to dismiss this case without the factual evidence provided herein."

Based on the summary judgment evidence presented, the district court first held that Cornerstone is ineligible for membership in the UIL because it is qualified for membership in TAPPS: it meets the definition of an eligible parochial school under TAPPS's constitution and bylaws. The district court alternatively concluded that Cornerstone is ineligible for membership in the UIL because TAPPS's board of directors' decision not to renew Cornerstone's membership, which resulted from Cornerstone's inducement of basketball players in violation of TAPPS's recruiting rules, "had the same effect, for rule 12(d) purposes, as a suspension or revocation."

During oral argument before this court and despite their opposition to the district court's holding, plaintiffs conceded that they did not allege a claim regarding the UIL's application of section 12(d) to Cornerstone and that the issues handled through summary judgment were not germane to the claims they maintain. Similarly, despite supporting the district court's holding, defendants could not identify any reason why the district court's granting of their summary judgment motion was necessary for its ultimate judgment of dismissal of the case. Defendants' motion to dismiss, which the district court granted in full, specifically sought dismissal of all claims. And, as noted above, in their motion for summary judgment, defendants reasserted that granting their motion to dismiss would resolve all claims in the case.

Thus, it is not clear from the record that the district court needed to order defendants to move for summary judgment or to rule on that motion after granting defendants' motion to dismiss. As plaintiffs do not contend that the parties' treatment of the summary judgment motion constituted a de facto

19

amendment of the complaint to allege a claim for which Cornerstone's qualification under section 12(d) is material, and because, by affirming the district court's order granting defendants' motion to dismiss, we dispose of the entire case, we vacate the district court's order granting summary judgment.

### III. CONCLUSION

For the forgoing reasons, we AFFIRM the district court's judgment in so far as it grants defendants' motion to dismiss and results in dismissal of the case and VACATE the judgment in so far as it grants defendants' motion for summary judgment.  Costs shall be borne by plaintiffs.