# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 6, 2011

No. 10-40246

Lyle W. Cayce
Clerk

AJAY GAALLA, Medical Doctor; HARISH CHANDNA, Medical Doctor; DAKSHESH "KUMAR" PARIKH, Medical Doctor,

Plaintiffs-Appellees

v.

CITIZENS MEDICAL CENTER; DAVID P. BROWN; DONALD DAY; JOE BLAND; ANDREW CLEMMONS, Medical Doctor; JENNIFER HARTMAN; PAUL HOLM; LUIS GUERRA,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Southern District of Texas
No. 06:10-CV-00014

---

Before REAVLEY, BENAVIDES, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Appellee, a county-owned hospital, appeals the district court's order enjoining it from preventing Appellants, three cardiologists, from exercising their clinical privileges at the hospital. We **REVERSE**.

I.   FACTS AND PROCEEDINGS

A.   Facts

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-40246

Dr. Harish Chandna, Dr. Dakshesh Parikh, and Dr. Ajay Gaalla (collectively, "Cardiologists") are cardiologists who hold staff privileges at two hospitals in Victoria, Texas: DeTar Hospital ("DeTar") and Citizens Medical Center ("CMC"). CMC is a county-owned, nonprofit hospital run by a county-appointed board of managers ("Board"). TEX. HEALTH & SAFETY CODE ANN. § 263.041. DeTar Hospital is a private, for-profit hospital. Because the Cardiologists have clinical privileges at both hospitals, they can practice cardiology and see patients at either hospital. Although the Cardiologists have staff privileges at CMC, they are not CMC staff because they have not signed a contract with CMC. The Cardiologists are the only cardiologists with privileges to practice at DeTar; they started the cardiology program at DeTar and own an interest in the equipment at the hospital.

CMC has five cardiologists and one cardiovascular surgeon, Dr. Yusuke Yahagi, who have clinical privileges and have also signed contracts with CMC. Yahagi joined the CMC staff in 2007 and has been CMC's only cardiovascular surgeon since 2009. The relationship between the Cardiologists and Yahagi deteriorated quickly after Yahagi began working at CMC in 2007. CMC presented testimony that the interpersonal friction between the Cardiologists and CMC staff boiled over into shouting matches and name-calling on at least one occasion.

The Cardiologists eventually declined to refer their patients to Yahagi, stating that he had a high mortality rate and that he was performing inappropriate surgeries. They also testified that they were under intense pressure from CMC to refer their patients to Yahagi. Chandna attested that CMC's Administrator and Yahagi confronted the Cardiologists about their lack of referrals for forty-five minutes at a cardiology department meeting. On December 16, 2009, CMC sent letters to the Cardiologists asking them to explain their failure to refer patients to Yahagi and informing them that their answers

2

would be taken into account in deciding whether their clinical privileges at CMC would be renewed. After the Cardiologists filed this lawsuit, CMC sent the Cardiologists a letter retracting the request for information and stating that referrals would not be a consideration in renewing their privileges.

Yahagi testified that, prior to his arrival at CMC, the Cardiologists threatened to "run him out of town" if he did not sign a contract with DeTar, which he did not. Yahagi also alleged that the Cardiologists engaged in what amounted to a smear campaign against him by telling other physicians and patients that he was performing unnecessary surgeries, that he was not a good doctor, and that he had a high mortality rate. Yahagi testified that he told members of CMC staff, including the chief of staff, that if his problems with the Cardiologists were not resolved, he would leave.

On January 13, 2010, in response to Yahagi's complaint, CMC's chief of staff sent a letter to the chairman of the Board noting that "[t]hrough the years . . . there have been many differences, disparities, and complaints originating from Citizens Medical Center staff, nursing staff, Medical Staff toward [the Cardiologists] and vice-versa." The letter advised the Board that Yahagi had been the victim of harassment to the point that the "the community is in jeopardy of losing its cardiovascular surgical care." The chief of staff referred Yahagi's complaints to the Board for resolution.

In response to the letter, CMC negotiated a contract with Yahagi whereby Yahagi became the exclusive provider of cardiovascular surgery at CMC. His contract was for one year, renewable annually, and terminable on ninety-days notice. The Board also considered closing the cardiology department so that only cardiologists contracted with CMC could see patients at the hospital. In preparation for a February 17, 2010 board meeting, the Board prepared a draft resolution closing the department. The draft resolution listed the Cardiologists by name.

No. 10-40246

On February 3, 2010, CMC hired an outside consultant, Michael Williamson, to consult on how the hospital should deal with the dispute between Yahagi and the Cardiologists. Williamson, a former executive at CMC, reviewed documents and interviewed CMC staff but did not interview the Cardiologists. At the February 17 meeting, Williamson presented the results of his research and agreed with the Board that closing the cardiology department was a reasonable solution to the problem. After Williamson made his presentation, the Board amended the resolution to remove the Cardiologists' names and subsequently approved it. The final resolution ("Resolution") stated that the hospital was "experiencing operational problems" that were "disruptive" to the "operations of the heart program," and that the problems "materially threate[ed] the continued viability of the heart program." According to the Resolution, "[o]nly those physicians who are contractually committed to [CMC] to participate in [CMC's] on-call emergency room coverage program shall be permitted to exercise clinical privileges in the cardiology department or as part of [CMC's] heart program." The Resolution also ratified CMC's exclusive contract with Yahagi. Because the Cardiologists were not under contract with CMC, the Resolution had the effect of preventing them from exercising their clinical privileges and treating patients at CMC.

B.    Proceedings

The Cardiologists filed suit on the day that the Resolution was to take effect, seeking a temporary restraining order ("TRO"), preliminary and permanent injunctions, and damages. The suit alleged causes of action for violations of the Cardiologists' substantive due process rights under the Fourteenth Amendment, violations of the Racketeer-Influenced and Corrupt Organizations (RICO) Act, and civil conspiracy. The district court granted the TRO, expressly predicating the grant only on the Cardiologists' substantive due process claim.

No. 10-40246

On March 12, 2010, after a two-day hearing, the district court issued a preliminary injunction enjoining CMC from implementing the Resolution. The district court held that the Cardiologists had a property interest in their staff privileges at CMC. The district court found that the Board undertook this action "based upon economic considerations rather than 'grounds that are reasonably related to the purpose of providing adequate medical care.'" It then found that: (1) the Cardiologists stood to suffer irreparable harm in the form of lost goodwill, patient loyalty, and reputation; (2) CMC had not shown any offsetting harm from the proposed injunction because the possibility that Yahagi would leave CMC was speculative; and (3) an injunction would serve the public interest by allowing patients a broader choice of cardiologists at CMC. The Cardiologists timely appealed.

II.   DISCUSSION

A.   Standard of Review

"A district court's grant of a preliminary injunction is reviewed for abuse of discretion." *Women's Med. Ctr. of N.W. Hous. v. Bell*, 248 F.3d 411, 418–19 (5th Cir. 2001). We review findings of fact for clear error and conclusions of law de novo. *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008).

A "preliminary injunction is an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. FEMA*, 512 F.3d 727, 734 (5th Cir. 2008).

B.   Substantive Due Process

5

No. 10-40246

CMC argues that the district court abused its discretion in granting the preliminary injunction because the Cardiologists did not demonstrate a substantial likelihood of success on their substantive due process claim.  We assume, *arguendo*, that the Cardiologists have a property interest in their clinical privileges at CMC.  CMC argues that the Resolution is a legislative act and that the Resolution does not violate the Cardiologists' substantive due process rights by depriving them of their clinical privileges because CMC had a conceivable rational basis in closing the cardiology department to staff.  The Cardiologists argue that the Resolution is not legislative because CMC's December 16 letter and its draft resolution show that the Resolution was, in effect, "an individualized decision against each of the Physicians based on allegations of professional misconduct."

A governmental action[1] is legislative if it applies to a large group of interests.  *Martin*, 130 F.3d at 1149. Even if, as the Cardiologists claim, the Resolution was effectively an individualized decision targeted at the Cardiologists, this is irrelevant to determining whether the Resolution was a legislative act.  In *Vulcan Materials Co. v. City of Tehuacana*, this court evaluated the legislative nature of a city council ordinance prohibiting corporations from quarrying within city limits.  238 F.3d 382, 384 (5th Cir. 2001).  Vulcan sued, arguing that the ordinance was an adjudicative act intended to exclude the company.  *Id.* at 388.  This court held:

> That the ordinance states as a reason for its enactment the intention of a rock quarry (undoubtedly Vulcan) to begin blasting operations does not call into question its legislative character. The ordinance applies to any party who would employ the prohibited means to quarry within the city limits, and that Vulcan's impending quarrying may have provided the entire impetus behind the ordinance does not transform it into an adjudicative decision.

---

[1] The Resolution is a governmental action because CMC is a county-owned hospital. *See Martin v. Mem. Hosp. at Gulfport*, 130 F.3d 1143, 1149 (5th Cir. 1997).

*Id.*

The Resolution, on its face, prohibits all physicians, not just the Cardiologists, from practicing in CMC's cardiology department unless the physician is contractually committed to CMC. The fact that the Board is not an elected body does not meaningfully distinguish this case from *Vulcan*. Decisions of hospital boards can be legislative acts. *See Martin*, 130 F.3d at 1149. In *Martin*, this court held that a county-owned hospital board's decision to enter into an exclusive contract with a doctor was a "quasi-legislative decision not based on [the appellant's] individual competency." *Id.* It held that the appellant had no procedural due process rights and applied rational basis review to the appellant's substantive due process claim. *Id.* at 1149–50. Read together, *Martin* and *Vulcan* teach that government-owned hospital decisions that are generally applicable are legislative decisions, even if the decision was motivated by a few individuals. Thus, even if CMC enacted the Resolution to exclude only the Cardiologists, the Resolution is a "legislative act" because it excludes any cardiologist seeking to practice at CMC without a contract with the hospital.

In evaluating whether a legislative act violates substantive due process, this court applies rational-basis scrutiny. *Jackson Court Condo., Inc. v. City of New Orleans*, 874 F.2d 1070, 1078 (5th Cir. 1989). "Under rational-basis scrutiny, the regulation is accorded a strong presumption of validity and must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for [it]." *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009) (quotations omitted). "As long as there is *a* conceivable rational basis for the official action, it is immaterial that it was not *the* or *a* primary factor in reaching a decision or that it was not *actually* relied upon by the decisionmakers or that some *other* nonsuspect irrational factors may have been considered." *Reid v. Rolling Fork Pub. Util. Dist.*, 854 F.2d 751, 754 (5th Cir. 1998) (citations omitted) (emphasis

in original).  In the context of staff privileges at hospitals, this court has held that  "[s]ubstantive due process is satisfied if applicants are judged and considered on grounds that are reasonably related to the purpose of providing adequate medical care."  *Hyde v. Jefferson Parish Hosp. Dist. No. 2*, 764 F.2d 1139, 1141 (5th Cir. 1985) (citation and internal quotation marks omitted). The Resolution would satisfy substantive due process if there were a conceivable reason for it that was "reasonably related to the purpose of providing adequate medical care." *Id.*  Whether a governmental action passes rational basis muster is a question of law that this court reviews *de novo.  Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000).

Preventing Yahagi from leaving CMC was a conceivable rational basis for closing the cardiology department.  Although the district court found that CMC's concern that Yahagi would leave was speculative, rational basis review only requires a "reasonably conceivable state of facts." *Cornerstone Christian Sch.*, 563 F.3d at 139.  The record provides ample evidence supporting CMC's claim that Yahagi's departure was a reasonably conceivable possibility.  Yahagi testified that he told CMC that he would leave if the disruptions involving the Cardiologists did not cease.  CMC's chief of staff testified that he was worried about Yahagi leaving.  Although Yahagi was under contract with CMC, his contract was terminable with ninety-days notice.  CMC presented testimony that it would be difficult to find a suitable replacement for Yahagi and that, without Yahagi, CMC would not be able to perform cardiac surgeries.  Furthermore, CMC's heart program would be "at a standstill" because CMC bylaws require cardiologists to have a cardiac surgeon on standby in order to treat their patients.

The district court was understandably concerned about testimony that Yahagi's mortality rates were greater than the national average.  Even if this were true, CMC did not act irrationally by attempting to keep a criticized cardiac

No. 10-40246

surgeon when faced with the alternative of no cardiac surgeon at all. CMC presented testimony that losing Yahagi and the cardiac program would be "devastating" for the community. That DeTar also had a cardiac program does not change this result because it is rational for a public hospital to want to have its own program to serve the community instead of relying on a private hospital. We hold that preventing Yahagi from leaving was a rational basis for the Resolution. Because keeping Yahagi from leaving CMC was a conceivable rational basis for the Resolution, the Cardiologists' substantive due process claim did not have a substantial likelihood of success, and the district court's grant of the preliminary injunction was an abuse of discretion.

III.   CONCLUSION

For the foregoing reasons, the district court's order enjoining CMC from implementing the Resolution is **REVERSED**.